# Keefer v. The Lancaster Intelligencer and News Journal.

*Libel—Privileged communication—Malice—Damages—Demurrer.*

1. A communication to be privileged must be made upon a proper occasion, from a proper motive, in a proper manner and be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself as in the ordinary case of libel. Exaggeration and unjustifiable comments may deprive a publication of what would otherwise be its privileged character.

2. Written words published of another which have a tendency to injure the latter in his or her office, profession, calling or trade are libelous, and in a civil action therefor it is unnecessary that the declaration or statement of claim should contain an averment of special damages.

3. The tirades of councilmen and the exaggerated reports of council proceedings are not excuses for such publications nor sufficient screens behind which a newspaper can hide, particularly when such publications are sensational and made chiefly for political purposes.

4. A demurrer admits all the facts properly and sufficiently pleaded, including an allegation in the statement in an action for libel, that the defendant knew the charges published to be untrue.

5. Where the publication charges upon the plaintiff the commission of an indictable offence, the presumption of his innocence is evidence that the publication is false and without probable cause, sufficient to put the defendant to proof of the facts to support his claim for privilege.

Montgomery *v.* New Era Printing Co., 229 Pa. 165.

Libel. Demurrer. C. P. Lancaster Co., Nov. T., 1922, No. 75.

*Charles L. Miller* and *Henry C. Niles,* for demurrer.

*S. R. Zimmerman* and *John A. Coyle,* contra.

LANDIS, P. J., Oct. 4, 1924.—This is an action for libel, and the plaintiff has filed his statement, setting forth the several causes of grievance upon which he relies. The defendants have demurred to the statement and the case comes before us in that form. Actions of libel and slander are expressly excepted out of the Practice Act of May 14, 1915, P. L. 483, and, therefore, the effect and consequences of the demurrer are to be considered under the law as heretofore laid down by the courts.

In Com. *v.* Primrose, 2 W. & S. 407, it was held that a demurrer admits the truth of all the matters of fact properly and sufficiently pleaded, and as the legality of the respondent's commission sufficiently appeared in the pleadings, he was entitled to judgment in his favor; and in Evans *v.* Tibbins, 2 Grant,

451, that, if the defendant demurs generally to a declaration consisting of several counts, plaintiff is entitled to judgment if any of the counts are sufficient under the law to support the action, even though some of them are defective, since the demurrer admits the truth of all the matters well pleaded. In Com. *v.* Walter, 86 Pa. 15, it was held that, in a suggestion for a writ of *quo warranto,* an averment that money was paid by respondent to M. for other than the necessary and proper expenses expressly authorized by the Act of April 18, 1874, P. L. 64, "but for corrupt and illegal purposes in procuring his election," a violation of the act was sufficiently charged, and that, when the defendant demurred to the whole of the suggestion, the demurrer was an admission of all the facts well pleaded, and that judgment for the Commonwealth having been given upon the demurrer, a judgment of ouster must follow. In Wildee *v.* McKee, 111 Pa. 335, the plaintiff in his declaration averred that he was by profession a teacher; that the defendants conspired with their confederates to ruin him in his profession, and, in pursuance and in execution of their said conspiracy, maliciously spoke and published of him in his profession as teacher words (set forth at length with innuendoes) which imputed to him the want of integrity and capacity, mental and moral. It was held to be error to sustain a demurrer to the sufficiency of the declaration. Mr. Justice Sterrett, in delivering the opinion of the court, said: "Coupled, as this count is, with the recitals and averments by which it is preceded, and followed by an averment of special damages, we cannot, in view of the authorities, . . . say the charge therein contained is not actionable. We have no right to indulge in any speculation as to the answer the defendants may make to the charges contained in the declaration. They elected by their demurrer to take the position that the recitals and charges contained in the declaration, assuming them to be true, are insufficient to warrant a verdict and judgment in favor of plaintiff. In this they were sustained, erroneously, as we think, by the court below." In Price *v.* Conway, 134 Pa. 340, it was held that any written words published of another which have a tendency to injure the latter in his or her office, profession, calling or trade are libelous, and, in a civil action therefor, it is unnecessary that the declaration or statement of claim should contain an averment of special damage. See, also, Holland *v.* Flick, 212 Pa. 201. The important question, therefore, arises whether sufficient appears upon the face of the statement to support the action.

It is averred that the plaintiff enjoyed the confidence, esteem and respect of all persons who knew him, and that his character for honesty, integrity and fair dealing was unimpeached; that from Jan. 14, 1920, to Jan. 16, 1922, he was the Controller of the City of Lancaster and had never been guilty of any embezzlement, larceny, shortages, falsifications or irregularities in his accounts or any misconduct whatsoever in his office. The defendants traded as a partnership, under the name of The Lancaster Intelligencer and News Journal, and were the owners and proprietors of a daily evening newspaper, known as The Lancaster Intelligencer, and of a daily morning newspaper, known as The News Journal. These papers were published daily, except Sunday, in the City of Lancaster, and had a large circulation throughout the city and in the several boroughs, villages and rural districts of Lancaster County.

After the plaintiff had ceased to be controller, an audit was prepared by one Elmer L. Hatter, an accountant, covering a period from May 1, 1918, to April 10, 1922. What was set forth in that audit was not shown in the statement. It was addressed to "The Chairman and Members, The Finance Committee of Councils, The City of Lancaster, Pennsylvania," and was, on Sept. 13, 1922, delivered to the members of the said committee. On Oct. 4,

Keefer *v.* The Lancaster Intelligencer and News Journal.

1922, it was read at a public meeting of the city councils. It is asserted that this report contained certain false, scandalous, defamatory and malicious writings, statements and allegations of and concerning the plaintiff as former Controller of the City of Lancaster, and that the defendants, well knowing the premises and intending to injure the plaintiff and to deprive him of his good name, esteem and respect, on Oct. 5, 1922, published in The News Journal, in large bold-faced type, extending as headlines across the entire front page of the newspaper, the following: "Ex-City Officials Face Arrest for Misconduct. Common Council Orders Prosecution Unless Vital City Records, Now Missing, Are Quickly Returned." And in smaller type, after the headlines, the following: "Act When Accountants Say Absent Documents Delay Work on Audit. Canceled Checks, Pages from Ledger, Bond Coupons and Invoices Gone, Auditors Report. Council Resolution Urges 24 Hours' Grace Before Suits Are Filed. Shortage of $13,000 Suspected. With a determination to protect the taxpayers of Lancaster and bring former city officials to justice who may have been guilty of gross misconduct in public office, Common Council members last evening passed a resolution authorizing legal proceedings against heads of various departments during the days when the 'machine' held control of City Hall." In an innuendo, it is averred that the meaning of the words was "that plaintiff had criminally, wickedly, deliberately and intentionally and with intent to cheat and defraud the City of Lancaster and to deceive the officials of said city, falsified and connived and conspired with others to falsify, destroy or erroneously and unlawfully keep the books, accounts and records of the City of Lancaster, and had cheated and defrauded the said city and had illegally taken and embezzled moneys from the said city."

It is further averred that, on Oct. 5, 1922, the defendants published in their newspaper, known as The Intelligencer, the following false, scandalous, illegal, defamatory and malicious writing, to wit: "Ex-City Officials Face Arrest. Coalition Councilmen Demand Prosecution of Men Figuring in $14,000 City Fund Shortage. Action Taken on Resolution of Major Guilford After Revelations of City's Audit are Bared. Hetrick Wants Guilty Jailed. Prosecution of every responsible official of the former 'machine' city administration who is implicated in shortages of more than $14,000 in city accounts was not only recommended but demanded within the next twenty-four hours by coalition councilmen last night when the report of the four-year audit was presented." Again: "The old city administration was a mad-house of indefinite business dealings, according to the evidence in the audit. Money is due the city on every hand from the departments as conducted under the old administration. This, it has been decided, must be made good under threat of prosecution. What the audit, if completed to the fullest extent, would mean has not even been surmised by the most imaginative of the councilmen. City officials who may have been guilty of misusing their offices were to be stamped with the indelible mark of dishonesty. Councilman John N. Hetrick demanded that all guilty parties be sent to jail. 'I say to you gentlemen, that if somebody has been cutting pages out of books and has been making erasures and substitutions, the citizens ought to know it,' he declared. 'The persons implicated are guilty of a crime, gentlemen, and ought to be sent to jail.'" On the first page of the paper, headed "An Editorial," was the following: "Lancaster is called upon once more to hang her head in shame because of her political gang. The report of the auditors submitted last night shows that the mishandling of the people's money by the 'old crowd' was scandalous. And what do they find? A long list of shortages, showing that the people have been robbed. A number of important records lost, canceled checks gone, original

Keefer *v.* The Lancaster Intelligencer and News Journal.

purchase invoices disappeared, paid bond coupons missing and original books with pages deliberately torn out. In the eyes of city councils this is a criminal offence. Every honest citizen feels as if he himself had been robbed."

It is also averred that, on Oct. 6, 1922, the following was published in The News Journal: "Mayor Demands Return of Missing City Records. E. M. Kauffman, W. W. Keefer, C. K. Will, Walter G. Bushong and William E. Johnson Given Until Midnight To Return Records." On the same date, in the issue of The Intelligencer, appeared the following: "Ex-Officials Pass Buck in Audit Revelations. Former Colored Janitor May Become 'the Goat' for Former City Officials. Workers May Try to 'Pass Buck' To Man Who Swept Floors. Five Given Until Midnight To Return Missing Records. Caught in a hopeless tangle of indirect business transactions for which they were officially if not morally responsible, former city officials are now seeking to 'pass the buck' to a Negro janitor whose only responsibility consisted of sweeping the floors of City Hall for the old administration." Also: "Five City officials are given until to-morrow to return the missing records. The officials named are: C. K. Will, former water department superintendent; W. W. Keefer, former city controller; Walter G. Bushong, former police chief, and William E. Johnson, former chief of the fire department." In bold-faced type, on the first page, appeared the following: "Two Ex-City Hall Workers May Owe Funds to the City, Report of Auditors States. At least two of the former City Hall 'bread and butter' crew may owe the city money, according to the report on the four-year audit which was presented to City Councils Wednesday night. The alleged refund lies between C. K. Wills, former water department superintendent, and the former city controller, one of whom, the report avers, owes the city $206.50." By innuendo, the meaning of these publications was said to be "that the plaintiff, as former City Controller of the City of Lancaster, had criminally, wickedly, deliberately, intentionally and with intent to cheat and defraud the City of Lancaster, and to deceive the officials of said city, falsified, connived and conspired with others to falsify, destroy or erroneously and unlawfully keep the books, accounts and records of the City of Lancaster during his tenure of office, and had cheated and defauded the said city and had illegally taken and embezzled moneys from the said city, and was guilty of crimes for which he, the said plaintiff, would and should be punished."

It is further averred that, on Oct. 7, 1922, in bold-faced type, the following appeared in The News Journal: "Time Limit for Return of Records Ends To-day. Ex-Officials Deny They Know Anything of Missing Papers. City Solicitor Silently Awaiting Expiration of 24-Hour Period. Glaring Bungle in City Affairs Shown by Study of Report of Auditors."

It is alleged that the defendants knew the charges were untrue when they made them, and that the said publications were a false and malicious libel. Taking, then, the publications as printed in these newspapers, and also considering that the demurrer recognizes the truth of the facts set forth in the statement, and, therefore, admits that the defendants knew the charges to be untrue when they made them, can it be said that no sufficient grounds of libel appear therein? It seems to us that the publications are libelous, and that, their truth being admitted, the demurrer should be overruled and judgment entered for the plaintiff, unless some other and sufficient reasons are advanced to the contrary.

It was urged on the argument that the plaintiff was not named. Of course, this statement is incorrect, as will be seem by the quotations above made. He is referred to specifically as W. W. Keefer, former city controller, and also as

the former city controller. It is needless, then, to discuss this phase of the case.

The remaining point raised is that the publications were privileged and, therefore, not actionable. In Montgomery *v.* New Era Printing Co., 229 Pa. 165, the same reason was presented, and the court entered a judgment of nonsuit. On appeal, the judgment was reversed, and Mr. Justice Potter, delivering the opinion of the court, said: "In the present action, the plaintiff made out a *prima facie* case, and the burden was then upon the defendant to make out its defence. If the publication was a privileged communication, or if there was probable cause for the defendant to believe that the statements were true, that was a matter to be shown as a defence. The defamatory articles were based in part upon a report of a meeting of a committee of the city councils of Lancaster. There was, however, no evidence before the court that such a meeting of the committee was held or that the articles fairly reported the facts as they actually occurred. As was held in Conroy *v.* Pittsburgh Times, 139 Pa. 334, in order that a publication be privileged, it must be shown to have been made upon a proper occasion, from a proper motive, based upon reasonable or probable cause, and in a proper manner. Unjustifiable comments may deprive a publication of what would otherwise be its privileged character. Ordinarily, the publication of pertinent statements made in the course of judicial and legislative proceedings is absolutely privileged; but even as to them, this quality may be lost if the published account be exaggerated. Thus, in Pittock *v.* O'Niell, 63 Pa. 253, Justice Sharswood says: 'It has been held to be libelous to publish a highly-colored account of judicial proceedings mixed with the party's own observations and conclusions: Stiles *v.* Nokes, 7 East, 493; Lewis *v.* Clement, 3 Barn. & Ald. 702.' In the present case it was the duty of the defendant to establish, by way of defence, if it could do so, the privileged character of its publication; either that the defamatory words substantially as it published them were spoken at the committee meeting or that, acting with due diligence, it was deceived into the belief that they had been so uttered, and in that belief had published them, with fair and reasonable comments upon the proceedings. Not until proof of this character had been submitted would the question arise for the determination of the court as to whether or not the matter was privileged." It seems to us that this case is conclusive of the present one.

In McGaw *v.* Hamilton, 184 Pa. 108, it was held that "it is not enough that the slanderous words were uttered in a legislative hall or in a court of justice to establish a claim to absolute immunity;" that "a member of a legislative body cannot take advantage of his official position to give expression to private slanders against others, and then claim that the words were privileged because they were spoken in the course, and as a part, of a public discussion of a pending measure." In Gray *v.* Pentland, 2 S. & R. 23, Mr. Justice Yeates, in speaking of the constitutional provisions protecting free speech, and so forth, said: "I have no doubt that an individual who maliciously, wantonly and without probable cause asperses the character of a public officer in a written or printed paper delivered to those who are invested with the power of removing him from office is responsible to the party injured in damages, although such paper is masked under the specious cover of investigating the conduct of such officer for the general good. Public policy demands no such sacrifice of the rights of persons in an official capacity, nor will the law endure such mockery of its justice."

The tirades of councilmen and the exaggerated reports of council proceedings are not excuses for such publications; nor sufficient screens behind which

a newspaper can hide, particularly when such publications are sensational and made chiefly for political purposes.

By the demurrer, the facts are admitted to be true as charged in the statement, and being of the opinion that at least some of them are libelous *prima facie*, the demurrer is overruled and judgment is now entered in favor of the plaintiff.

Demurrer overruled and judgment entered in favor of plaintiff.

From George Ross Eshleman, Lancaster, Pa.